# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

SARAH E. DECANTIS,                    :
:
           Plaintiff    :    No. 3:15-CV-0507
:
    vs.    :    (Judge Nealon)
:
CAROLYN W. COLVIN, Acting             :
Commissioner of Social Security,      :
:
           Defendant    :

**FILED
SCRANTON**

AUG 29 2016

PER_____
DEPUTY CLERK

## MEMORANDUM

On March 12, 2015, Plaintiff, Sarah E. DeCantis, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2] under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. §

1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For

the reasons set forth below, the decision of the Commissioner denying Plaintiff's

application for DIB and SSI will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her application for DIB on November 7, 2011, and her application for SSI on November 30, 2011, alleging disability beginning on November 20, 2010 due to a "broken leg, dislocated knee, [and] other leg problems." (Tr. 21, 170).[4]  The claim was initially granted by the Bureau of Disability Determination ("BDD")[5] on July 10, 2012 for a closed period of disability beginning on November 20, 2010 and ending on May 7, 2012. (Tr. 21). On July 31, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 21).  An initial hearing was held on August 8, 2013, before administrative law judge Michelle Wolfe, ("ALJ"), at which Plaintiff and an impartial vocational expert Patricia Chaleri, ("VE"), testified. (Tr. 42).  On August 22, 2013, the ALJ issued a partially favorable decision that Plaintiff was disabled through from the alleged onset date of November 20, 2010 through July

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on August 3, 2015.  (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

30, 2012 and therefore should be awarded DIB and SSI for this time period.  (Tr. 30).  On September 23, 2013, Plaintiff filed a request for review with the Appeals Council.  (Tr. 12).  On January 20, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on March 12, 2015.  (Doc. 1).  On August 3, 2015, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 9 and 10).  Plaintiff filed a brief in support of her complaint on October 16, 2015.  (Doc. 13).  Defendant filed a brief in opposition on November 18, 2015.  (Doc. 14).  Plaintiff did not file a reply brief.

Plaintiff was born in the United States on September 12, 1972, and at all times relevant to this matter was considered a "younger individual."[6]  (Tr. 158). Plaintiff went to school through sometime in the twelfth grade, but did not graduate, and can communicate in English.  (Tr. 65, 169, 171).  Her employment records indicate that she previously worked as a cook, waitress, and bartender.

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

(Tr. 161).  The records of the SSA reveal that Plaintiff had earnings in the years 1988 through 2006.  (150).  Her annual earnings range from a low of three hundred fifty-seven dollars and seventy-seven cents ($357.77) in 1991 to a high of twelve thousand one dollars and sixty cents ($12,001.60) in 2001.  (Tr. 150).  Her total earnings during those eighteen (18) years were ninety-nine thousand five hundred sixty-nine dollars and forty-one cents ($99,569.41).  (Tr. 150).

In a document entitled "Function Report - Adult" filed with the SSA on January 4, 2012,  Plaintiff indicated that she lived in a house with her husband. (Tr. 179).  When asked how her injuries, illness or conditions limited her ability to work, Plaintiff stated, "I can not stand on my own without aid.  I also can not bear any weight on my leg."  (Tr. 179).  From the time she woke up until the time she went to bed, Plaintiff sat with her leg elevated, made one (1) meal, and let her dog into her backyard.  (Tr. 180).  Plaintiff took care of her animals by feeding them and letting them outside.  (Tr. 180).  In terms of personal care, her husband laid her clothes out for her, she used handicap railings for bathing, and she was able to feed herself and use the toilet "ok."  (Tr. 180).   She was able to prepare meals for two (2) hours with the use of a wheelchair or office chair, washed the dishes and did the laundry while sitting, and assist her husband with grocery shopping by using crutches or a wheelchair.  (Tr. 181-182).   When asked to check what

4

activities her illnesses, injuries, or conditions affected, Plaintiff did <u>not</u> check

talking, hearing, seeing, memory, completing tasks, concentration, understanding,

following instructions, using hands, or getting along with others. (Tr. 184).

Regarding her concentration and memory, Plaintiff did not need special

reminders to take care of her personal needs, take medicine, or go places. (Tr.

181, 183). She could count pay bills, count change, handle a savings account, and

use a checkbook. (Tr. 182). She could pay attention for "as long as needed," was

able to finish what she started, followed written and spoken instructions well, and

handled stress and changes in routine "fine." (Tr. 184-185).

Socially, Plaintiff went outside one (1) to two (2) times a week accompanied

by another person, and could ride in, but not drive, a car. (Tr. 182). She did not

go anywhere on a regular basis, but spoke on the phone with family and friends.

(Tr. 183). She would watch television, but did not read or do yard work anymore.

(Tr. 183). She did not have problems getting along with family, friends,

neighbors, or others. (Tr. 184).

At her hearing on August 8, 2013, Plaintiff testified that she could not

return to work since May of 2012 because she could not stand for any period of

time, had a hard time sitting for any period of time without moving positions, and

had "a lot of swelling." (Tr. 67). Plaintiff stated that she woke up at about half

5

past ten (10) in the morning, would cook dinner with periods of rest, and did not shop for groceries or clothes. (Tr. 67-68). She testified that she experienced muscle spasms at least every hour that lasted anywhere from three (3) to twenty-five (25) minutes. (Tr. 69). When sitting, she would have to either adjust positions or stand up every fifteen (15) minutes, and was only able to stand for about ten (10) minutes. (Tr. 70). She did not carry anything. (Tr. 71). She had to elevate to elevate, compress, and ice her leg for twenty (20) minutes at a time, about five (5) times a day. (Tr. 69, 75). Plaintiff used a cane for ambulation, used her husband for help when not using her cane, and was unable to use socks because her "leg and foot swell so much that it just cuts the circulation completely off." (Tr. 71). She had to wear a compression sleeve on her legs to push the fluid out of her legs. (Tr. 72). The pain in her left leg was constant and present from the knee down. (Tr. 72). She had no feeling in her left leg at all, to touch or to temperature. (Tr. 72). Her bedroom was on the second floor, and it was difficulty for her to use the stairs, as she would go up and down one leg at a time or use her "backside [to go] up the stairs and down the stairs." (Tr. 73). After her third ankle surgery on her left ankle, she had very limited range of motion and was left with a twitch because of nerve damage. (Tr. 74). Plaintiff testified that she and her husband had to made modifications to their house, including removing all the

6

carpet so that her legs would not buckle and give out and installing a handicap

bathroom and shower chair because she could not longer stand in the shower. (Tr.

74).

## **MEDICAL RECORDS**

On November 21, 2010, Plaintiff visited the emergency room at Moses

Taylor Hospital in Scranton for left leg pain that resulted from tripping over her

dog while under the influence of alcohol. (Tr. 224, 226). Her discharge diagnosis

was "left leg pain due to spiral fracture of left-sided distal tibia and fibula with

marked displacement." (Tr. 224).

On November 23, 2010, Plaintiff underwent surgery performed by

Christopher Henderson, M.D. to fix the distal left tibia/ fibula fracture. (Tr. 226).

Dr. Henderson performed an open reduction and internal fixation with a medial

locking plat and the use of a demineralized bone matrix. (Tr. 226).

From December 1, 2010 to June 10, 2011, Plaintiff had seven (7) follow-up

appointments with Dr. Henderson after her surgery to repair her fractured tibia and

fibula. (Tr. 236-242). It was noted that, for the majority of visits, her pain was

better overall, she had no numbness or tingling in her toes, her swelling improved,

her hardware from the surgery was in a good position, her incision was well-

healed, her sensation was intact, and she had good strength and decent range of

motion with the ability to dorsiflex past neutral. (Tr. 236-240). At a visit on May 27, 2011, it was noted that Plaintiff "continued to have pain along her tibia into her ankle" that was worse with weight bearing, and that she continued to use a cane. (Tr. 241). Her exam revealed a well-healed incision with no erythema or drainage, but with swelling around the ankle joint, discomfort with range of motion, and tenderness along the tibia. (Tr. 241). Dr. Henderson was "concerned about nonunion" and ordered a CAT scan. (Tr. 241). She was instructed to stop physical therapy, and was given a prescription for Hydrocodone. (Tr. 241).

On June 10, 2011, at her visit with Dr. Henderson, it was noted that her CAT scan showed broken proximal screws, proximal callus formation with a fracture line through it, an obvious nonunion of the main fracture of the tibia, and a healed fibula. (Tr. 242). Dr. Henderson discussed the case with Dr. Thomas, and Plaintiff was referred for restabilization surgically. (Tr. 242). In the meantime, it was suggested that Plaintiff wear her fracture boot. (Tr. 242).

On June 21, 2011, Plaintiff had an appointment with Gregory Thomas, D.O. due to Dr. Henderson's concern of nonunion. (Tr. 247). A review of systems revealed that Plaintiff had intermittent swelling of the left lower extremity consistent with her injury, but that she was negative for excessive amount of pain of the left tibia and had an appropriate amount of pain with increased activity. (Tr.

248).  Her physical examination revealed: that her left lower extremity was neurovascularly intact with motor and sensation and that there was no pain or crepitus with active or passive range of motion; that there was quadriceps atrophy in her left leg; that her left knee was negative for patella instability, joint line tenderness, and varus-valgus instability; that her left lower leg was negative for calf tenderness, pretibial edema, and pain with varus valgus, anterior, and posterior stress of the tibia and level of the fracture site, but positive for hypersensitivities with palpation over the surgical incision and palpable hardware; a healed fibular shaft fracture; and a reduced tibiotalar joint in good alignment. (Tr. 249).  It was also noted that Plaintiff's scans revealed that there was evident posterior healing, but not so evident anterior healing.  (Tr. 249).  Dr. Thomas indicated that Plaintiff was allowed to weight bear as tolerated on the lower left extremity with full range of motion, and gave her a prescription for physical therapy for quadriceps strengthening.  (Tr. 249).

On July 27, 2011, Plaintiff had an appointment with Gregory Thomas, D.O. for posterior tibial tendinitis in her left lower extremity, left quadriceps atrophy that was improving, and "ORIF, left distal tibia and fibula, now healed." (Tr. 245).  It was noted that Plaintiff ambulated without a device and complained of diffuse, intermittent, nonspecific pain of the left lower extremity and intermittent

swelling that, when resolved, revealed the hardware from her surgery. (Tr. 245).

Plaintiff also complained of left foot and ankle pain and burning of her left lower

extremity. (Tr. 245). Her physical examination revealed that she: had no effusion

or erythema of her left knee; was negative for quadriceps atrophy in her left leg;

had no pain with manipulation, bony prominence or tenting of the skin secondary

to hardware in her left tibia and fibula; had positive posterior tibial tendinitis in

her left ankle with an inability to single leg toe raise; and, upon radiography, had a

healed distal tibia fracture with a healed fibular fracture plate and screws intact,

but with some broken screws proximally and a fracture line present. (Tr. 245).

Plaintiff was instructed that she was permitted to bear weight as tolerated with full

range of motion and no restrictions and that she needed aggressive physical

therapy to strengthen her foot and ankle. (Tr. 246). Dr. Thomas noted that the

"majority of the patient's current pain is due to abnormal gait mechanics

secondary to muscle weakness of her left lower extremity." (Tr. 246). Plaintiff

was also told that her recovery may take up to two (2) years for her strength and

gait abnormalities to resolve. (Tr. 246).

On August 31, 2011, Plaintiff had an appointment with Dr. Sebastianelli for

left leg pain. Her exam revealed "intact CMS and skin" and some peri-incisional

numbness. (Tr. 342). It was noted that x-rays revealed that Plaintiff had "AP

lateral and internal/ external oblique of the involved leg reveal fixation failure proximally, nonunion of the main tibia fragment, marked screw loosening, fibular shortening and rotation." (Tr. 341). Plaintiff was assessed as having nonunion with angulation. (Tr. 342).

From February 14, 2011 to October 3, 2011, Plaintiff attended physical therapy at ProCare for her ankle. (Tr. 255-330). At her discharge visit on October 3, 2011, it was noted that she was being discharged because she reached her maximum level of therapy and because she was referred for a surgical procedure to remove the broken hardware from her prior surgery. (Tr. 327). At this appointment, Plaintiff rated her left ankle pain at a one (1) out of ten (10) at rest and a six (6) out of ten (10) with activity with exacerbating factors being the weather and walking and relieving factors being elevation and medication. (Tr. 329). She also rated her left knee pain at a zero (0) out of ten (10) at rest and a two (2) out of ten (10) with activity, with exacerbating factors being ambulating and/ or stair climbing and relieving factors being rest and stretching. (Tr. 329). Her sensation was intact and symmetrical to light touch except with decreased sensation over the incision site, her reflexes were intact and symmetrical, and there were no signs of "neuro weakness." (Tr. 329). It was noted that her ankle was in mild pain with palpation and had mild and generalized edema. (Tr. 329).

11

On October 10, 2011, Plaintiff underwent an operation to remove the broken hardware, plates, and fractured screws of the left tibia. (Tr. 344, 346). Her preoperative and postoperative diagnoses were "tibia nonunion with dislocated tib-fib joint." (Tr. 344).

On October 24, 2011, Dr. Sebastianelli opined that Plaintiff was temporarily disabled from November of 2010 with a pending end date due to tibial nonunion and chronic pain. (Tr. 332).

On October 24, 2011, Plaintiff had a follow-up appointment with Dr. Sebastianelli after the hardware removal procedure. (Tr. 338). It was noted that Plaintiff had significant nonunion with a significant length mismatch of the fibula and proximal dislocation of her "tib/fib joint." (Tr. 338). Plaintiff was assessed as having "malunion/ nonunion of the tibia with chronic dislocation of the proximal tib/fib joint" and that she would need reconstructive procedures. (Tr. 338).

On October 31, 2011, Plaintiff underwent an MRI of her left knee due to continued left knee pain in order to assess for dislocation and ligament injury. (Tr. 360). The impression from the MRI states that there was edema within the soft tissues between the fibular head and proximal tibia, suggestion of a mild superior and lateral subluxation of the fibular head in relation to the proximal tibia, and a thin but intact lateral collateral ligament without surrounding edema. (Tr. 361).

12

On that same day, Plaintiff also underwent a CT scan of her left knee, which revealed moderate degenerative changes of the medial and lateral joint compartments with evidence for degenerative changes of the articular surfaces as well as components of subchondral sclerosis of the medial and lateral femoral condyles and to a lesser extent tibial plateaus. (Tr. 363). It also revealed a component of scattered osteopenia within the femur and proximal tibia consistent with disuse osteopenia. (Tr. 363). It was noted that correlation of the CT scan with the MRI "shows the possibility of at least partial subluxation of the proximal fibula in relation to the tibia." (Tr. 363).

On November 23, 2011, Plaintiff had a follow-up appointment after the hardware removal procedure. (Tr. 337). Her incisions were well-healed, and both a CT scan and MRI revealed "substantial tib/fib injury proximally." (Tr. 337). Dr. Sebastianelli noted "at this point, I think she is going to be best served by one bone leg, do a posterolateral bone graft with possible internal fixation as well. Iliac crest and augmentation with bone putty and bone stimulator." (Tr. 337).

On January 23, 2012, Plaintiff had an appointment with Dr. Sebastianelli for left leg pain. (Tr. 371). It was noted that she "desires to proceed with ORIF and iliac crest bone grafting" and that her pain was a five (5) out of ten (10) at her visit. (Tr. 371). Her exam revealed that her lower extremities had good motion at

13

the knee and ankle with generalized discomfort with palpation of the lower left leg, but with 5/5 strength and intact gross sensation by soft touch. (Tr. 371). Dr. Sebastianelli's finding was that Plaintiff had left tibia nonunion, and she was scheduled for surgery. (Tr. 371).

On February 16, 2012, Plaintiff had surgery performed by Dr. Sebastianelli to correct the tibia nonunion. (Tr. 391). Plaintiff underwent the following: (1) a closed intramedullary rodding of the tibial nonunion; (2) decompression of peroneal nerve; and (3) open reduction and fusion of proximal tib/fib dislocation. (Tr. 395). Plaintiff had an EBI bone stimulator in place to help with the nonunion, and was discharged on February 17, 2012. (Tr. 391).

On February 20, 2012, Plaintiff resumed physical therapy at ProCare Physical Therapy with a diagnosis of ankle and foot pain and abnormal gait. (Tr. 407). Plaintiff reported that she had moderate to severe pain and limitation with activities of daily living as well as severe pain and limitation with recreational tasks. (Tr. 407). She had restrictions for her left lower extremity in that she was only permitted to engage in fifty percent (50%) weight bearing activities, including bed mobility, transfers, personal care, and prolonged positions. (Tr. 407). Her assessment noted she had generalized pain throughout the left lower extremity distally from the knee with generalized left lower extremity edema distal

14

to her knee, decreased range of motion of her left knee and ankle, decreased strength and endurance with disuses atrophy observed at the thigh, and decreased functional abilities with increased left lower extremity sensitivity distal to her knee. (Tr. 408). Plaintiff was instructed to attend physical therapy two (2) times a week for four (4) weeks. (Tr. 409).

On February 23 and 27, 2012, Plaintiff had physical therapy appointments at ProCare. (Tr. 412-413). It was noted that Plaintiff was able to "achieve 30lbs of [lower left extremity] pressure pain free and as [weight bearing] increases, pain increases to patient advised to keep [weigh bearing] pain free. Patient safe with proper gait pattern to 30lbs whereas 65lbs would be 50% [weight bearing]." (Tr. 412-413). Plaintiff reported she had been experiencing moderate to severe pain and limitation with activities of daily living as well as severe pain and limitation with recreational tasks and being unable to return to work at that time. (Tr. 412-413). It was noted that Plaintiff had been using crutches to ambulate and had restrictions for only fifty percent (50%) weight bearing activities (which as noted above equated to sixty-five (65) pounds). (Tr. 412-413). Plaintiff reported that she had pain and limitation with all activity, "including bed mobility, transfers, personal care, prolonged positions (sitting, standing, amb), and all higher level tasks as she is currently [non-weight bearing]." (Tr. 412-413).

On March 1, 2012, Plaintiff had an appointment with Dr. Sebastianelli for follow-up "of her IM rodding and fusion of her proximal tib-fib joint for tibial nonunion and dislocated proximal tibial joint.' (Tr. 423). It was noted that Plaintiff was doing well, and that she should continue weight bearing as tolerated. (Tr. 423).

On March 2, 2012, Plaintiff had a physical therapy appointment at ProCare Physical Therapy. (Tr. 414). It was noted that Plaintiff's ankle and knee range of motion was "very stiff," and that her response to physical therapy intervention was good. (Tr. 414).

On March 5, 2012, Plaintiff had another physical therapy appointment at ProCare. (Tr. 415). It was indicated that Plaintiff continued to progress in her weight bearing tolerance in her left lower extremity to forty percent (40%). (Tr. 415).

On March 6, 2012, Plaintiff had a physical therapy appointment at ProCare. (Tr. 416). It was noted that she had soreness in her left knee with hamstring spasming, and that she continued to progress with weight bearing in her left lower extremity to forty percent (40%). (Tr. 416).

On March 13, 2012, Plaintiff had an appointment at ProCare Physical Therapy. (Tr. 417). It was noted that Plaintiff was able to "achieve 50lbs of [left

16

lower extremity] pressure pain free and as [weight bearing] increases, pain

increases so [patient is] advised to keep [weight bearing] pain free. [Patient] safe

with proper gait pattern to 50lbs whereas 65lbs would be 50% [weight bearing]."

(Tr. 417). Plaintiff reported, however, that she had pain in her lower extremity

while ambulating with forty (40) pounds, that her knee continued to feel sore and

stiff, and that drainage was mild over her incision. (Tr. 417).

On March 15, 2012, Plaintiff had a physical therapy appointment at ProCare

physical therapy. (Tr. 467). It was noted that Plaintiff reported that she had lower

extremity pain when ambulating with thirty-five (35) to forty (40) pounds and that

her knee was sore and stiff. (Tr. 467).

On March 22, 2012, Plaintiff had a physical therapy appointment. (Tr. 460).

She reported experiencing mild to moderate pain and limitation with activities of

daily living and moderate to severe pain and limitation with recreational tasks.

(Tr. 460). She also reported a thirty (30) percent improvement post-operatively

secondary to continued decreased pain, improving knee and ankle range of

motion, and improving strength. (Tr. 460). She was ambulating with two (2)

crutches. (Tr. 460). Her limitations in her knee and ankle range of motion

continued to affect her function and therapy. (Tr. 460).

On March 28, 2012, Plaintiff had an appointment with Dr. Sebastianelli.

(Tr. 422). It was noted that all wounds were healed, there was excellent knee range of motion, and her "tib-fib" appeared stable. (Tr. 422). Dr. Sebsastianelli ordered x-rays, and instructed Plaintiff to continue with "aggressive rehab." (Tr. 422).

On April 23, 2012, Plaintiff had a physical therapy appointment at ProCare Physical Therapy. (Tr. 458). She reported experiencing mild to moderate pain and limitation with activities of daily living and moderate to severe pain and limitation with recreational tasks. (Tr. 458). She also reported a thirty (30) to thirty-five (35) percent improvement post-operatively secondary to continued decreased pain, improving knee and ankle range of motion, and improving strength. (Tr. 458). She was ambulating with one (1) crutch. (Tr. 458). Her limitations in her knee and ankle range of motion continued to affect her function and therapy. (Tr. 458).

On May 7, 2012, Plaintiff had an appointment with Dr. Sebastianelli for follow-up. (Tr. 425). It was noted that "she is pain-free with full weightbearing," that she "needed some confidence with balance and strengthening," that her ankle range of motion was acceptable, that her knee range of motion was near full, that all incisions were healed, and that she could do a straight leg raise test. (Tr. 425). Her x-rays revealed that there was progressive union of the tibial injury and

18

stabilization of the proximal tib-fib joint. (Tr. 425).

On May 31, 2012, Plaintiff had a physical therapy appointment. (Tr. 456). She reported experiencing mild to moderate pain with activities of daily living and moderate to severe pain and limitation with recreational tasks. (Tr. 456). She was able to stand for five (5) to ten (10) minutes before needing to sit secondary to increased pain and being unsteady. (Tr. 456).

On June 15, 2012, Louis B. Bonita, M.D. performed a consultative examination. (Tr. 92). He opined that Plaintiff could: (1) occasionally lift and/ or carry twenty (20) pounds; (2) frequently lift and/ or carry ten (10) pounds; (3) sit for about six (6) hours in an eight (8) hour work day; (4) engage in unlimited pushing and pulling within the aforementioned weight restrictions; and (5) stand and/ or walk for six (6) hours in an eight (8) hour work day. (Tr. 90-91). Dr. Bonita opined that Plaintiff met Listing 1.06A for the period of November 20, 2010 through May 7, 2012, because as of that date, there was solid union of the tibia. (Tr. 102).

On July 6, 2012, Plaintiff had a physical therapy appointment. (Tr. 454). It was noted that she reported experiencing mild to moderate pain and limitation with activities of daily living and with recreational/ social tasks. (Tr. 454). She reported improvements in bed mobility, sleeping, transfers, squatting, prolonged

sitting and standing, prolonged unassisted ambulation, stair climbing, and performing personal care and household tasks. (Tr. 454). She noted she was able to stand for twenty (20) minutes to prepare meals or clean before needing to sit due to pain. (Tr. 454). She also reported that she was unsteady secondary to balance impairment that was slowly improving. (Tr. 454). Her assessment noted that she had increased range of motion in her knee with decreased stiffness, minimal improvements in weight bearing strengthening due to significantly increased pain, and an improvement with her gait. (Tr. 455).

On July 27, 2012, Plaintiff had an appointment with ProCare Physical Therapy. (Tr. 452). It was noted that Plaintiff demonstrated increased range of motion and strength, and that she reported increased ease with functional activity. (Tr. 453).

On July 31, 2012, Plaintiff had an appointment with Dr. Sebastianelli. (Tr. 505). It was noted that Plaintiff had full extension of her knee, that her proximal "tib-fib" joint was stable, that her ankle had some stiffness, that she could fully bear weight, and that she was walking "much better." (Tr. 505). Her x-rays revealed complete union of the tibia and a stabilized proximal "tib-fib." (Tr. 505). She was instructed to discontinue physical therapy. (Tr. 505).

On August 2, 2012, Plaintiff was discharged from ProCare's physical

therapy that she underwent for "surgical aftercare for the musculoskeletal system" for her ankle and foot. (Tr. 448). Her diagnosis was "abnormal gait." (Tr. 448). It was noted that she was discharged because her goals were met and her maximum level of therapy had been reached. (Tr. 448). Plaintiff was able to independently: turn and scoot in bed; go from supine to sitting using her abdominal muscles; transfer to and from her bed and a chair without assistive devices; transfer to and from a car without an assistive device with difficulty; ambulate even terrain without an assistive device with difficulty for over one thousand (1,000) feet; and climb stairs with a railing with difficulty for ten (10) steps. (Tr. 448-449). She was able to engage in activities of daily living with mild to moderate pain and limitation during and/ or after "specific IADL affecting performance," was unable to perform specific work activity secondary to pain or limitation, and had moderate to severe limitation in specific recreational activity affecting performance. (Tr. 449). Plaintiff reported that she was able to go up and down the stairs and perform light housework "easier." (Tr. 449). It was noted that the following goals were partially met: decrease in pain by twenty-five percent (25%) in two (2) weeks; decrease in edema or effusion by fifty percent (50%) in two (2) weeks; improve range of motion by twenty-five percent (25%) in two (2) weeks; improve balance, endurance, and gait by twenty-five percent (25%) in one

(1) month; improve "IADL;" improve ambulation and stair climbing to prior level of function; and improve "LEFS score" by a minimum of fifty percent (50%) from her initial evaluation. (Tr. 449). It was noted that her long-term goal of improving work performance "in related activities" was not met. (Tr. 449). Her left ankle and knee pain were rated at a two (2) out of ten (10) while at rest on the pain scale and a five (5) out of ten (10) with activity. (Tr. 449). Plaintiff had no "neuro weakness noted, but [had] decreased lower left extremity strength noted throughout with disuse atrophy noted in the thigh." (Tr. 449).

On August 27, 2012, Plaintiff had an appointment with Wayne Sebastianelli for ankle pain. (Tr. 507). It was noted that her ankle looked "quite good." (Tr. 507). Dr. Sebastianelli recommended a repeat x-ray series in November and a follow-up appointment. (Tr. 507).

On November 12, 2012, Plaintiff had an appointment with Dr. Sebastianelli for her left "tib-fib nonunion with revision fixation and grafting, etc." (Tr. 508). It was noted that Plaintiff was doing well, was not using ambulatory support devices, had occasional ankle pain and swelling, had a full knee range of motion and a reasonable ankle range of motion, had excellent stability and peroneal, anterior, and posterior tib function, had a stable ankle, and had well-healed incisions. (Tr. 508). It was also noted that x-rays taken that day showed a well-

fixed, well-aligned tibia fracture and that the fibular fracture looked "like it healed." (Tr. 508).

On May 21, 2013, Plaintiff had a follow-up appointment with Dr. Sebastianelli. (Tr. 513). It was noted that she had minor tenderness over the proximal screw at the fibular head, and that Dr. Sebastianelli would remove that screw. (Tr. 513).

On June 11, 2013, Plaintiff had an appointment with Dr. Sebastianelli for left knee pain and edema with activity that had been occurring the prior three (3) months. (Tr. 516). A physical exam revealed: peripheral edema around her ankle and foot; a visible and palpable screw head over the lateral aspect of her knee at the fibular head with sensitivity in this area; no pain with palpation over the main shaft of the fibula; discomfort with palpation over the distal tibial shaft; good knee range of motion; 5/5 strength with fair quad tone; and intact neurologic, gross sensation across the left leg by soft touch. (Tr. 516). Plaintiff was scheduled to have the fibula hardware removed. (Tr. 517).

On July 8, 2013, Plaintiff had a follow-up appointment after the fibula hardware removal procedure. (Tr. 523). It was noted that she was doing well, and was instructed to continue with appropriate exercise and follow-up in three (3) months. (Tr. 523).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

27

which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of September 30, 2012. (Tr. 25). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of November 20, 2010. (Tr. 25).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of impairments of the following: "fracture of left tibia and fibular,

status post open reduction and internal fixation of tibial nonunion with

malreduction of proximal tibia-fibula dislocation (20 C.F.R. 404.1520© and

416.920©)." (Tr. 25).

At step three of the sequential evaluation process, the ALJ found that from

November 20, 2010 through July 29, 2012, Plaintiff was disabled because "the

severity of her] impairments met the criteria of section 1.06 of 20 C.F.R. Part 404,

Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,

416.920(d), and 416.925). (Tr. 25-26). The ALJ also held that Plaintiff had not

developed any new impairment(s) since July 30, 2012, the date her disability

ended, and that medical improvement occurred as of this date. (Tr. 26-27).

At step four, the ALJ determined that, beginning July 30, 2012, Plaintiff had

the RFC to perform a narrow range of light work with limitations. (Tr. 27).

Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform a narrow range
> of light work as defined in 20 CFR 404.1567(a) and 416.967©
> in that [Plaintiff] is able to lift/ carry 10 pounds frequently, 20
> pounds occasionally but she is limited to standing/ walking for
> no more than four hours during the course of an eight-hour

ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

workday and would require an option to sit/stand with the ability to sit up to 30 minutes at one time and stand for up to five minutes at one time. She can occasionally stoop, crouch, balance and climb, but never on ladders, ropes, or scaffolds. She must avoid crawling, kneeling, and pushing/ pulling with the lower extremities. She must avoid concentrated exposure to temperature extremes, wetness, and hazards such as moving machinery and unprotected heights.

(Tr. 27).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, she was unable to perform past relevant work, but that given her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform. (Tr. 29-30).

Thus, the ALJ concluded that Plaintiff was disabled between November 20, 2010 and July 20, 2012 and therefore should receive DIB and SSI for this time period, but was not under a disability as defined in the Social Security Act at any time after July 30, 2012. (Tr. 30).

**DISCUSSION**

On appeal, Plaintiff, while Plaintiff does not challenge the ALJ's decision that she was disabled under Listing 1.06 from the alleged onset date through July 30, 2012, and thus should receive DIB and SSI for that time period, Plaintiff challenges the ALJ's determination that she no longer met Listing 1.06 from July

30, 2012 to the date of her decision and also asserts that the ALJ concocted her own RFC determination without giving appropriate weight to Plaintiff's treating physician, Dr. Sebastianelli. (Doc. 13, pp. 13-18). Defendant disputes these contentions. (Doc. 14, pp. 15-26).

### 1.   <u>Listing 1.06</u>

Initially, Plaintiff asserts that the ALJ erred in determining that Plaintiff was was no longer disabled as of July 30, 2012 because she still exhibited limitations and only partially successful results with physical therapy. (Doc. 13, pp. 13-15). Listing 1.06 requires fracture of the femur, tibia, pelvis, or one of the tarsal bones with: (A) solid union not evident on appropriate medically acceptable imaging and not clinically solid; and (B) inability to ambulate effectively, as defined in 1.00(B)(2)(b), and return to effective ambulation did not occur and is not expected to occur within 12 months onset. <u>See</u> 20 C.F.R. § 404, Subpart P, Appendix 1, § 1.06. The medical records as discussed by the ALJ in her decision note that the surgery performed by Dr. Sebastianelli in February 2012 resulted in complete union of the tibia and a stabilized proximal "tib-fib" as shown on x-rays. (Tr. 422, 425, 505, 508). Therefore, the ALJ's decision that Plaintiff no longer met Listing 1.06 as of July 30, 2012 is supported by substantial evidence because the requirements of this Listing were no longer met, and the ALJ's decision in this

regard will not be disturbed on appeal.

### 2.   RFC Determination

Plaintiff asserts that the ALJ created her own RFC and that more weight should have been given to Dr. Sebastianelli's opinion from 2011, before the tibial union surgery was performed, that Plaintiff was temporarily disabled. (Doc. 13, pp. 15-18).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's

RFC determination that the plaintiff could perform light work, even though this

determination was based largely on the opinion of one medical expert, because the

medical expert's opinion was supported by the medical evidence of record); Baker

v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he

rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577

F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an

adequate explanation for the weight he gave to several medical opinions, remand

was warranted). "The ALJ's explanation must be sufficient enough to permit the

court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012

U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not

make speculative inferences from medical reports and may reject a treating

physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the relevant medical opinion evidence, the ALJ gave some weight to the opinion of Dr. Bonita, who found Plaintiff disabled until May 7, 2012, and opined as to what Plaintiff's limitations were. (Tr. 28). The ALJ only gave this opinion some weight because she determined that the evidence did not document complete union until July of 2012, but determined that the limitations as opined by Dr. Bonita were well-supported by the medical evidence. (Tr. 28). The ALJ gave little weight to Dr. Sebastianelli's opinion that Plaintiff was temporarily disabled as of November 2010 until "pending" because "this opinion is overly vague and offers little guidance in determining [Plaintiff's] [RFC] beginning July 30, 2012." (Tr. 28).

Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ properly afforded weight to the opinion evidence, and

based on the RFC, did not base her RFC determination on speculation because the limitations the ALJ included in the RFC determination not only encompassed those opined by Dr. Bonita, but in fact included even further limitations as to err on the side of caution. (Tr. 25-29). As such, substantial evidence supports the ALJ's RFC, and it will not be disturbed on appeal.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed, and the appeal will be denied.

A separate Order will be issued.

**Date**: August 26, 2016

/s/ William J. Nealon
**United States District Judge**

35